IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| DANNY DAY, | ) CIVIL ACTION 4:04-1683-MJP-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) REPORT AND RECOMMENDATION |
| JO ANNE B. BARNHART | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 14, 2002, alleging disability since June 9, 2001, due to heart disease, open heart surgery, and stent placement (Tr. 83, 99, 214). His applications were denied initially and upon reconsideration. Following a hearing on August 13, 2003, the Administrative Law Judge (ALJ), F. W. Christian, found, in a decision dated November

14, 2003, that plaintiff was not disabled because he retained the residual functional capacity (RFC) for a range of sedentary[1] work and could perform other work that existed in the national economy. (Tr. 11-21).  The Appeals Council denied plaintiff's subsequent request for review and the ALJ's decision became the Commissioner's "final decision" for purposes of judicial review under 42 U.S.C. § 405(g).

## II.  FACTUAL BACKGROUND

The plaintiff, Danny Day, was born on May 20, 1963, and was 40 years of age on the date of his hearing before the ALJ. (Tr. 83).  He has a seventh grade education and past relevant work as a farm worker, bagger, car mechanic, heavy equipment operator, laborer, and maintenance laborer (Tr. 105, 109-115).

## III.  DISABILITY ANALYSIS

The plaintiff's arguments consist of the following:

(1)    Did the ALJ fail to properly assess the Plaintiff's eligibility for disability benefits under the Medical-Vocational guidelines?

(2)    Did the vocational testimony contradict the Dictionary of Occupational Titles?

(3)    Does the ALJ provide a rationale as to how he determined the plaintiff's residual functional capacity as required by Social Security Ruling 96-8p?

---

[1]"Sedentary work involves lifting no more than 10 pounds at a time with occasional walking and standing as needed to carry out job duties.  20C.F.R.  §§404.1567(a), 416.967(a) (2004).

-2-

(4)    Did the ALJ properly evaluate the plaintiff's credibility?

(Plaintiff's brief).

In the decision of November 14, 2003, the ALJ found the following:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.    The claimant has the following residual functional capacity: The claimant can lift and carry ten pounds occasionally and one or two pounds frequently. The claimant cannot stand or walk for prolonged periods or perform strenuous exertion. He cannot work with exposure to temperature or humidity extremes and cannot perform overhead work with his left upper extremity.

8.    The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.    The claimant is a "younger individual (20 CFR §§ 404.1563 and 416.963)

-3-

10. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

11. The claimant has transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.26 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as assembler, (Dictionary of Occupational Titles (DOT) 726.684-110), inspector (DOT #726.684-050) and sorter (DOT #521.687-086). There are 6300, 2100 and 400 of these jobs in the state economy, respectively. There are 688,000, 354,000 and 64,000 in the national economy.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 20-21).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial

evidence[2] and (2) whether the legal conclusions of the Commissioner are correct under controlling law.  Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978).  "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 390.  Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict.  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).   The Court's scope of review is specific and narrow.   It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence.   42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.  Five questions are to be asked sequentially during the course of a disability determination.   20 C.F.R. §§ 404.1520, 1520a (1988).  An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

_____

[2]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." <u>See</u> 20 C.F.R. § 404.1505(a); <u>Blalock</u>, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. § 404.1503(a).  <u>Hall v. Harris</u>, 658 F.2d 260 (4th Cir. 1981).   An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied.  <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82-62.  The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act.  42 U.S.C. § 423 (d)(5).  He must make a <u>prima facie</u> showing of disability by showing she was unable to return to her past relevant work.   <u>Grant v. Schweiker</u>, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to  return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.   The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  <u>Id</u>. at 191.

## IV.  MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case.  The medical records as set out by the plaintiff in his brief  have not been disputed by the defendant. Therefore, the undisputed and relevant medical evidence as stated by the plaintiff is set forth herein.

Aiken Regional Medical Center (ARMC) provided medical records on the plaintiff from November 15, 2000, through January 8, 2002, that chronicled the patient's history of examination, diagnosis, treatment and surgery of unstable angina, coronary artery disease, hyperlipidemia, and associated problems. The medical records indicate the plaintiff was examined, x-rayed and operated on twice to clear severely blocked arteries and stents implanted in those arteries to keep them from collapsing. Following surgery, Dr. Ansermo L. Arthur, M.D., of Aiken Cardiovascular Associates treated the plaintiff with multiple prescriptive therapies, and advised him to follow-up with his appointments as recommended or as his condition warranted (Tr. 143-157).

Dr. Arthur provided medical records on the plaintiff from November 28, 2000, through June 12, 2003, that chronicled the patient's history of examination, diagnosis and treatment for coronary artery disease, hypertension, hyperlipidemia, and associated problems. Dr. Arthur indicated that the plaintiff continued to suffer from high blood pressure and high cholesterol. Dr. Arthur instructed plaintiff to stop smoking or his condition would deteriorate. Dr. Arthur continued to treat the plaintiff with prescriptive therapy to try and regulate his conditions. (Tr. 158-169, 198-199).

On July 9, 2002, James J. Hill, Jr., M.D., of Carolina Orthopedic Associates performed an MRI of the plaintiff's left shoulder.  The findings were tendonosis/tendonopathy involving the rotator cuff tendon complex (Tr. 178). On July 15, 2002, Dr. Hill found that plaintiff had significant

-7-

impingement syndrome and multiple changes and teninosis of the rotator cuff (Tr. 177). On August 22, 2002, Dr. Hill performed surgery on plaintiff to remove impeding degenerative tissue in his left shoulder and followed up with prescriptive therapy. Dr. Hill advised plaintiff that his condition was not curable only manageable and urged him of the importance to continue his prescriptive therapy. (Tr. 144-176, 189-194).

Dr. Timothy Shannon provided medical records on plaintiff from September 26, 2002, through February 25, 2003, that chronicled the patient's history of examination, diagnosis, treatment and surgery of left knee instability secondary to an ACL (anterior cruciate ligament) tear and associated symptoms. Dr. Shannon indicated that plaintiff suffered from degenerative joint disease and the pain and problems associated with such disease. Dr. Shannon performed a left ACL reconstruction on the plaintiff and advised him to follow up with physical therapy. Dr. Shannon indicated that plaintiff complained that the pain was too severe to participate in physical therapy. Dr. Shannon treated plaintiff with prescriptive therapy and advised him to follow up regularly as recommended. On February 25, 2003, plaintiff informed Dr. Shannon that he was still having occasional functional giving away of the left knee and the physical exam revealed that plaintiff lacked 2-3 degrees of full extension but could flex the knee to 110 degrees. (Tr. 200-212).

## V.  PLAINTIFF'S SPECIFIC ARGUMENTS

As previously stated, plaintiff argues that the vocational testimony ("VE") is contradicted by the Dictionary of Occupational Titles (DOT). Plaintiff asserts that the VE is required to explain this contradiction under SSR 00-4p. Plaintiff argues that the ALJ limited him to sedentary, unskilled work, and put further restrictions on him that he could not walk more than 100-200 feet at a time,

could not perform overhead work with his left arm, and could not be exposed to humidity or temperature extremes. Plaintiff asserts that the VE cited three occupations: assembler, inspector, and sorter, and indicated "that's all I have at the sedentary level." (Tr. 60). Plaintiff argues that he is illiterate and the job of assembler would be beyond his capabilities in that it is a language two level which encompasses having a vocabulary of 5000-6000 words, with a reading rate of 190-215 words a minute, and the ability to write compound and complex sentences. DOT, 4th Ed., Vol. II at 733, 734, and 1011.Plaintiff contends that the assembler occupation carried by far the highest number of available openings, 6300 in the state, according to the VE testimony. Plaintiff argues that "the reduction of the number of occupations available to the plaintiff down to two may change the ALJ's position on the erosion of the occupational base . . . this is a finding for the ALJ to make. Further, the inspector position has a reasoning level of two, which requires the ability to follow detailed instructions. It is not clear that the plaintiff has this ability with his educational background and test results, and if this job is eliminated there are only 400 jobs remaining in the one occupation of nutsorter." (Plaintiff's memorandum p. 18). Plaintiff argues that despite the fact that the VE contradicted the DOT description of at least one of the jobs cited, the VE provided no explanation as to why she was able to cite this job as an example of a position available to an illiterate claimant when the DOT provides otherwise. Therefore, plaintiff argues that the case should be remanded for an explanation.

Defendant responds to this argument in her brief by stating that ". . . the ALJ did ask the vocational expert whether the jobs she identified required reading and writing. The vocational expert indicated that illiteracy did not have an effect on jobs she identified (Tr. 60)." Further, defendant argues that based on SSR 00-4p, an individual who can do simple, unskilled work can generally

perform with an SVP of 1 or 2 and that "all three of the jobs the VE identified have an SVP of 2." (P. 14 of defendant's memorandum). Defendant also contends that SSR 96-9p states that "basic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient." (Defendant's brief p. 14). Thus, defendant argues that plaintiff's contention is unfounded.

A review of SSR 00-4p reveals that if there is a conflict between the VE testimony and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying upon the VE evidence to support a decision about whether a claimant is disabled. Specifically, SSR 00-4p reads as follows:

> This Ruling clarifies our standards for the use of vocational experts (VEs) who provide evidence at hearings before administrative law judges (ALJs), vocational specialists (VSs) who provide evidence to disability determination services (DDS) adjudicators, and other reliable sources of occupational information in the evaluation of disability claims. In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and explain in the determination or decision how any conflict that has been identified was resolved.

(SSR 00-4p).

In reviewing the VE testimony, it is clear that after the VE named jobs she believed the plaintiff could perform, the ALJ specifically asked "do any of these jobs require reading and writing?" (Tr. 60). The VE responded that she "assumed the person in the hypothetical was illiterate." However, the assembler job requires a specific vocational preparation (SVP) time of

level two (2) and a language level of two. The following is a description of each of the jobs listed

by the VE from the DOT, 4th Edition:

**726.684-110   TOUCH-UP SCREENER, PRINTED CIRCUIT BOARD ASSEMBLY**

Industry Designation: Electronic Components and Accessories Industry Inspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges.

STRENGTH: Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

GENERAL EDUCATIONAL DEVELOPMENT

**Reasoning**: Level 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

Math: Level 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

**Language**: Level 2 - READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking

-11-

up unfamiliar words in dictionary for meaning, spelling,
and pronunciation.  Read instructions for assembling
model cars and airplanes.

WRITING: Write compound and complex sentences, using
cursive style, proper end punctuation, and employing
adjectives and adverbs.

SPEAKING: Speak clearly and distinctly with appropriate
pauses and emphasis, correct punctuation, variations in
word order, using present, perfect, and future tenses.

SPECIFIC VOCATIONAL PREPARATION:  Level 2 - Anything
beyond short demonstration up to and including 1 month


726.684-050  FILM TOUCH-UP INSPECTOR

Industry Designation:  Electronic Components and Accessories
Industry

Inspects and repairs circuitry image on photoresist film
(separate film or film laminated to fiberglass boards)
used in manufacture of printed circuit boards (PCB's):
Inspects film under magnifying glass for holes, breaks,
and bridges (connections) in photoresist circuit image.
Removes excess photoresist, using knife. Touches up
holes and breaks in photoresist circuitry image, using
photoresist ink pen. Removes and stacks finished boards
for transfer to next work station. Maintains production
reports. May place lint free paper between dry film
sheets to avoid scratching circuit images on film.

STRENGTH:  Sedentary Work - Exerting up to 10 pounds of
force occasionally (Occasionally: activity or condition
exists up to 1/3 of the time) and/or a negligible amount
of force frequently (Frequently: activity or condition
exists from 1/3 to 2/3 of the time) to lift, carry,
push, pull, or otherwise move objects, including the
human body. Sedentary work involves sitting most of the
time, but may involve walking or standing for brief
periods of time.  Jobs are sedentary if walking and
standing are required only occasionally and all other
sedentary criteria are met.

GENERAL EDUCATIONAL DEVELOPMENT

**Reasoning**:  Level 2 - Apply commonsense understanding to
carry out detailed but uninvolved written or oral
instructions.  Deal with problems involving a few
concrete variables in or from standardized situations.

Math: Level 1 - Add and subtract two-digit numbers.
Multiply and divide 10's and 100's by 2, 3, 4, 5.
Perform the four basic arithmetic operations with coins
as part of a dollar.  Perform operations with units such
as cup, pint, and quart; inch, foot, and yard; and ounce
and pound.

**Language**: Level 1 - READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

SPEAKING: Speak simple sentences, using normal word order, and present and past tenses.

SPECIFIC VOCATIONAL PREPARATION: Level 2 - Anything beyond short demonstration up to and including 1 month


521.687-086  NUT SORTER

Industry Designation:  Canning and Preserving Industry

Alternate Titles:  Hull Sorter; Nut Picker; Nut Sifter; Picking-Belt Operator

Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers. May be designated according to kind of nut meat sorted as Almond Sorter (can. & preserv.); Peanut Sorter (can. & preserv.).


STRENGTH: Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

GENERAL EDUCATIONAL DEVELOPMENT

**Reasoning**:  Level 1 - Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Math: Level 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar.  Perform operations with units such

```
as cup, pint, and quart; inch, foot, and yard; and ounce
and pound.

Language: Level 1 - READING: Recognize meaning of 2,500
(two- or three-syllable) words.  Read at rate of 95-120
words per minute.  Compare similarities and differences
between words and between series of numbers.

WRITING: Print simple sentences containing subject,
verb, and object, and series of numbers, names, and
addresses.

SPEAKING: Speak simple sentences, using normal word
order, and present and past tenses.

SPECIFIC VOCATIONAL PREPARATION:  Level 2 - Anything
beyond short demonstration up to and including 1 month
```

(DOT, emphasis added).

Based on the fact that the plaintiff is considered to be illiterate, and the job of assembler as listed by the VE has the following language requirement "Language: Level 2 - READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes," the vocational evidence provided by the VE is not consistent with information in the DOT. Therefore, the ALJ must resolve this conflict before relying on the VE to support a determination or decision that the individual is or is not disabled. The ALJ should explain in the determination or decision how he resolved the conflict. The ALJ must explain the resolution of the conflict irrespective of how the conflict was identified.(SSR 00-4p).

Based on the above, the undersigned recommends that this case be remanded for an explanation as to the conflict, and/or finding by the ALJ as to whether the remaining occupations are in conflict with the testimony of the VE based on their language and reasoning requirements. If the ALJ resolves the conflict by finding that plaintiff cannot perform one or more of the jobs listed,

he should then decide if the remaining job or jobs constitute a significant number of jobs or if there has been a significant erosion of the plaintiff's occupational base.

Plaintiff also argues that the ALJ failed to properly evaluate the credibility of the plaintiff. Plaintiff asserts that the ALJ's statements do not provide an adequate rationale to deny plaintiff's credibility. Plaintiff states that "with regards to the fact that the plaintiff can occasionally using [sic] a riding mower, drive short distances, and can sit, this hardly constitutes substantial evidence to deny the plaintiff's credibility regarding his other allegations."  (Plaintiff's brief p. 20).

Defendant responds that the ALJ conducted the proper credibility analysis and cited substantial evidence to support his finding that plaintiff's subjective complaints were not entirely credible. Defendant argues that plaintiff's own testimony regarding his abilities and daily activities is also inconsistent with his allegation that he was unable to perform even the minimal physical demands of a limited range of sedentary work. Defendant asserts that plaintiff testified that he was able to walk one to two hundred feet without knee trouble, lift a tea pitcher, and sit without limitation. Plaintiff also testified that he was able to cut the lawn with a riding mower, straighten up a shop behind the house, and drive to go visit his brother. Thus, defendant argues that plaintiff's own testimony as to these abilities supports the ALJ's RFC determination.

In assessing complaints of pain, the ALJ must (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists,  (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record.  See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994).  A claimant's allegations of pain itself or its severity need not be accepted to the extent they are inconsistent with the available evidence, including objective

-15-

evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

As to allegations of pain, the Fourth Circuit has often repeated that, "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain, such as heat, swelling, redness and effusion." Craig, 76 F.3d at 592 (identifying two-step process by which ALJ must first determine if the claimant has demonstrated by objective medical evidence an impairment capable of causing the pain alleged and if so, must then assess the credibility of the claimant's subjective accounts of pain); Jenkins v. Sullivan, 906 F.2d 107, 109 (4th Cir. 1990).

The Commissioner has promulgated Ruling 96-7p to assist ALJs in determining when credibility findings about pain and functional effect must be entered, and what factors are to be weighed in assessing credibility.  The Ruling directs that,

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

-16-

An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Ruling 96-7p.

The ALJ cited numerous reasons for not finding the plaintiff's complaints credible. The ALJ considered objective medical evidence and stated the following in his findings, quoted verbatim, in part:

At the hearing, the claimant testified that he suffers from severe coronary artery disease, unstable angina, left shoulder impingement syndrome, a left knee reconstruction and illiteracy. He also takes Nitroglycerin that reportedly causes headaches and dizziness. The claimant stated that he is unable to lift groceries and his left knee gives away walking one hundred to two hundred yards. On the other hand, the claimant testified that he continues to smoke against doctor's orders, uses a riding lawn mower, drives, and can sit without difficulty. Thus, the undersigned finds that the claimant is not fully credible, to the extent that he can perform some work.

-17-

The claimant obviously has been diagnosed with coronary artery disease, hypertension, degenerative joint disease and left shoulder impingement syndrome. And, on December 12, 2001, the claimant's cardiologist, Dr. Arthur, noted that the claimant could not perform any strenuous physical activity. However, Dr. Arthur never stated that the claimant could perform no physical activity. In addition, as of November 14, 2002, the claimant was doing very well with regard to his shoulder, and has a good range of motion. His shoulder symptoms were also fully resolved, according to Dr. Hill. And, following his knee surgery, the claimant lacked only two to three degrees of full extension and could flex his knee to 110 degrees. The undersigned specifically notes that the medical evidence does not support a finding that the claimant's left knee gives away a few times a week, as alleged by his attorney.

Thus, the undersigned finds that the claimant is able to perform some work. However, when giving the claimant the benefit of the doubt and considering Dr. Arthur's opinion, the undersigned finds that the claimant can only perform a limited range of sedentary work. Accordingly, the undersigned finds the claimant retains the following residual functional capacity: The claimant can lift and carry ten pounds occasionally and one or two pounds frequently. He can not work with exposure to temperature or humidity extremes and can not perform overhead work with his left upper extremity.

(Tr. 17-18).

The undersigned concludes that there is substantial evidence to support the ALJ's decision with regards to plaintiff's credibility. A review of the transcript reveals that plaintiff testified that he takes Motrin 800 milligram for the pain in his knee and when his attorney asked "Can you give the Judge an idea of how frequently that (knee popping out or giving out) occurs and what actually happens there?" plaintiff responded that if he walks over 100 to 200 feet it will "pop out and then I have to sit down" and rest his knee. (Tr. 43). As to headaches, plaintiff testified that he gets a headache when he takes Nitroglycerin and that they last "probably four, five minutes." (Tr. 44). Plaintiff also testified that he gets headaches from his blood pressure medicine which last about a

day. Plaintiff testified that he is still smoking but has cut back on the amount. Plaintiff testified that he has occasional chest pain upon physical exertion but can lift a tea pitcher without any problem.(Tr. 50).  Plaintiff testified that he had no problem sitting. (Tr. 50). When asked by his attorney what he does on a typical day, plaintiff testified that he cuts the grass on his riding mower, straightens and cleans up his building in the back yard and goes to his brother's house to talk with him. (Tr. 48-49). Upon questioning by the ALJ, plaintiff testified that he cleans his tools in his building and can change the oil in the car. (Tr. 54). When asked if he helps out around the house with any of the housework, laundry, grocery shopping, plaintiff responded "I help- - usually help the old lady do something around the house if she wants something, you know."  (Tr. 56).

It is noted that in the hypothetical to the VE, the ALJ limited him to being restricted in his exertional ability to do jobs which do not require lifting, carrying, and handling of more than 10 pounds on an occasional basis, no more than one or two pounds frequently. The ALJ also restricted plaintiff to jobs that do not require any prolonged standing or walking and to no more than two hours in an eight hour work day. Further, the ALJ restricted plaintiff to no walking more than 100 to 200 feet at a time. The ALJ also restricted him environmentally to jobs that do not require him to be exposed to extremes of temperature and humidity and restricted to jobs which do not require strenuous physical exertion. The ALJ also restricted plaintiff to those jobs which do not require any overhead work with the left upper extremity. Thus, the ALJ took into consideration   plaintiff's testimony that if he walks more than 100-200 feet he has problems with his knee, that he cannot lift more that one to two pounds frequently (plaintiff testified that he could lift a pitcher of tea without problem), that he can perform no overhead work on the left upper extremity, and no strenuous activity. (Tr. 59). Also, it was assumed that he was illiterate. (Tr. 60). There were no medical records

regarding the frequency of plaintiff's knee problems and no medical evidence stating that he could not work because of his heart or shoulder problems. The ALJ restricted plaintiff to no strenuous activity as Dr. Arthur had recommended.

Based on the above and the hearing and hearing decision, the ALJ's evaluation of plaintiff's subjective complaints complies with the Fourth Circuit precedent and the Commissioner's regulations.  The ALJ adequately addressed each complaint, as discussed, and explained his evaluation and placed these restrictions in the hypothetical to the VE. Therefore, the undersigned concludes that there is substantial evidence to support the ALJ's determination as to plaintiff's credibility based on the objective medical evidence.


## VI.  CONCLUSION

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is,

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 30, 2005
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**

-20-

<u>Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"</u>
<u>&</u>

The **Serious** Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* <u>Mathews v. Weber</u>, 423 U.S. 261, 270-271 (1976); and <u>Estrada v. Witkowski</u>, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, <u>but</u> <u>not</u> <u>thereafter</u>, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* <u>Keeler v. Pea</u>, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and <u>Oliverson v. West Valley City</u>, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* <u>United States v. Schronce</u>, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, <u>Schronce v. United States</u>, 467 U.S. 1208 (1984); and <u>Wright v. Collins</u>, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* <u>Praylow v. Martin</u>, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In <u>Howard</u>, <u>supra</u>, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* <u>Lockert v. Faulkner</u>, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* <u>Branch v. Martin</u>, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and <u>Goney v. Clark</u>, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* <u>Wright v. Collins</u>, <u>supra</u>; and <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503
